UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

SONJA COONE,                          )
                                      )
            Plaintiff,                )
                                      )
v.                                    )         No. 1:16-cv-481
                                      )         Judge Phillips
CHATTANOOGA – HAMILTON                )
COUNTY HOSPITAL AUTHORITY,            )
                                      )
            Defendant.                )

## MEMORANDUM OPINION

Plaintiff Sonja Coone worked as a nurse in the Emergency Department at the Chattanooga – Hamilton County Hospital Authority d/b/a Erlanger Health System ("Erlanger"). In December 2015, Erlanger investigated a complaint that plaintiff had violated the Health Insurance Portability and Accountability Act ("HIPPA"), 42 U.S.C. §1320d-1, *et seq.*, when she accessed a patient's medical record and shared that information with the patient's sister, allegedly without the patient's consent. Following an investigation, plaintiff was terminated. Plaintiff claims that she was terminated because of her age and her use of Family and Medical Leave Act ("FMLA") leave.

Erlanger has filed a motion for summary judgment [Doc. 26] with supporting briefs, deposition testimony, and exhibits [Docs. 27, 31, 35]. The plaintiff has filed an opposing brief with supporting testimony and exhibits [Doc. 40]. For the reasons set forth herein, the defendant's motion [Doc. 26] will be **DENIED**.

## I.    Relevant Facts

### A.    Background

Erlanger is a large regional hospital that employs approximately 6,000 employees on several different campuses in Chattanooga, Tennessee and the surrounding region [Doc. 26-2 at ¶ 4]. Erlanger maintains extensive guidelines for employees relating to patient privacy, confidentiality, and compliance with HIPPA [*Id*. at ¶ 8].[1] Erlanger's Medical Records Authorization policy stipulates, "[a]n authorization must be received from the patient before any PHI is used or disclosed" [Doc. 26-2 at p. 36]. Erlanger requires its employees, including plaintiff, to complete annual training regarding the handling of confidential patient information and compliance with HIPPA [Doc. 26-2 at ¶ 9]. Further, Erlanger's Discipline policy provides that an employee may be terminated for "[c]ertain violations of the hospital's HIPPA guidelines" [*Id*. at ¶ 9; Doc. 26-2 at p. 81].

Kevin Spiegel became the Chief Executive Officer ("CEO") of Erlanger in April 2013. Once he became CEO, Mr. Spiegel emphasized to the Human Resources ("HR") Department his belief in the importance of patient confidentiality [Doc. 26-2 at ¶ 11]. From 2012 to 2017, Erlanger has terminated nine (9) employees, including plaintiff, for HIPPA violations [*Id*. at ¶ 12].

Plaintiff, currently age 53, began working at Erlanger in the late 1980s as a staff nurse on the Medical Surgery Floor and in the Emergency Department ("ED") [Doc. 26-1

---

[1]HIPPA regulates persons who have access to Protected Health Information ("PHI") and who may conduct electronic health care transactions.  42 U.S.C. § 1320d-1.  HIPPA provides for both civil and criminal penalties for the improper disclosure of protected medical information.  42 U.S.C. §§ 1320d-5, 1320d-6.

at pp. 18—20].[2]  After living in Alaska for several years, plaintiff returned to Tennessee in 2007 and to employment with Erlanger as a nurse with the admissions unit of the intensive-care unit [*Id.* at pp. 20—21].  This unit changed names several times during plaintiff's tenure and eventually became known as the Clinical Decision Unit ("CDU") until it merged with the ED in late 2014 [Doc. 26-1 at pp. 22—23].  The CDU was a "sister unit of the emergency room" which functioned as a holding area where patients from the ED who had been stabilized could await admission to an inpatient hospital room [*Id.* at pp. 25—26; Doc. 26-6 at ¶ 6].  To improve the efficiency of operations in the ED, Erlanger merged the CDU with the ED to improve the flow of patients and to have staff trained to work in both areas [Doc. 26-6 at ¶ 6].

Beginning in 2007 and every year until her termination, plaintiff used intermittent leave protected by the FMLA to care for her autistic son [Doc. 26-1 at pp. 36—38]. Erlanger uses an outside third-party administrator to verify and process employees' FMLA leave requests and to keep track of an employee's use of FMLA leave [Doc. 26-5 at ¶¶ 3—4].  Plaintiff informed her charge nurse when she needed to request FMLA leave and she also contacted Erlanger's third-party FMLA administrator [Doc. 26-1 at pp. 40—42]. Plaintiff testified, however, that Erlanger's records of her FMLA usage were not always accurate [Doc. 40-1 at p. 75].

---

[2]Erlanger's Baroness hospital, where plaintiff worked, is a Level 1 Trauma Center, which means the hospital can handle every aspect of any injury from treatment through rehabilitation [Doc. 26-6 at ¶ 4].

3

Cathryn Phillips became the Clinical Director of the Center for Emergency Services in March 2014 [Doc. 26-6 at ¶ 3]. Ms. Phillips had the authority to hire, fire, and discipline employees who worked in any of the Emergency Services Departments on Erlanger's campuses [*Id.* at ¶ 5]. While Ms. Phillips claims a "vague recollection" that plaintiff had some need for family leave, she was not involved with plaintiff's requests or approvals for FMLA leave [*Id.* at ¶ 10].

Jeneen Carman became the Director of the Baroness campus ED on October 26, 2015 [Doc. 26-3 at ¶ 4]. In this position, Ms. Carman reported to Ms. Phillips and all of the nurses, charge nurses, and assistant nurse managers of the ED reported to Ms. Carman [*Id.* at ¶ 5; Doc. 26-1 at p. 81]. Ms. Carman had the authority to hire, fire, and discipline nurses [Doc. 26-3 at ¶ 5]. However, Ms. Carman has never terminated an employee without consulting Erlanger's HR Department [*Id.* at ¶ 5].

B.    Plaintiff's Relationship with Cathy Phillips

Ms. Phillips placed plaintiff on a work improvement plan ("WIP") in January 2015. Plaintiff and Ms. Phillips have differing versions of how that came to be. Ms. Phillips states that, when the CDU and ED merged, plaintiff was resistant to working in the ED [*Id.* at ¶¶ 7—8]. Several Assistant Nurse Managers complained to Ms. Phillips that plaintiff repeatedly refused to work in the ED and constantly requested to be placed in the CDU [*Id.* at ¶ 8]. After several months of communicating regarding issues pertaining to her need to care for all types of trauma patients, Ms. Phillips made the decision to place plaintiff on a WIP [*Id.*].

Plaintiff claims that the WIP was an effort to force her to quit due to her use of FMLA leave [Doc. 40-1 at pp. 38—39]. In February 2015, shortly after she received the WIP, plaintiff complained to Dee Kennedy, Employee Relations Representative in HR, that she was "given a hard time" and "chastised" by Ms. Phillips for taking family leave [*Id.* at pp. 25, 54]. Plaintiff asked how to file a grievance, but Ms. Kennedy said, "Well, there's nothing I can do about that" and that she would support Ms. Phillips [*Id.* at pp. 26, 54]. Plaintiff also complained to Ms. Carman, who did not respond verbally but "her body language" indicated she "was not going to dispute or go against" Ms. Phillips [*Id.* at pp. 27—28].

After plaintiff was placed on a WIP, her performance improved significantly and Ms. Phillips gave her a positive performance evaluation in July 2015, commenting that plaintiff "has shown drastic improvement in her time management and communication skills" and "consistently gives great patient care and is a great resource to new staff" [Doc. 26-6 at ¶ 9, Ex. B].

As part of her case, plaintiff relies on numerous statements allegedly made by Ms. Phillips that demonstrate her bias against older employees and employees who use family leave. Specifically, plaintiff claims Ms. Phillips made the following statements:

- "You may have gotten away with this family leave with Yvonne Harris,[3] but you won't get away with it with me" [Doc. 40-1 at pp. 30, 52].

---

[3]Yvonne Harris was previously employed as Erlanger's Employee Relations Representative, a position that was held by Dee Kennedy at the time of plaintiff's termination [Doc. 40-2 at p. 5].

- Ms. Phillips referred to plaintiff's use of FMLA leave as "mental health breaks" [*Id.* at p. 80].

- "This is not [the] time to have a mental breakdown and [be] calling out [on] family leave" [*Id.* at p. 31].[4]

- Ms. Phillips called plaintiff an "old woman" and "old fart" [*Id.* at pp. 47—48, 77].

- "[T]he older nurse[s] that's calling out for family leave, it's got to stop and they've got to go. The ER is not for older nurses. It is for young nurses" [*Id.* at p. 39].

- "The older nurse[s], that are taking FMLA leave … they're going to go" [*Id.*].

- "I know you're getting older and you have problems with your memory. You may need to write this down" [*Id.* at p. 46].

- "[I]t had to stop, that the ER was for young nurses, not old nurses, and that taking family leave was not going to be tolerated" [*Id.* at p. 42].

- "Any nurse that has family leave, they're going" [*Id.* at p. 20].

- "[T]he ER was set up for younger nurses, not older nurses; … the older nurses … like a bunch of old farts, we didn't know what we were doing" [*Id.* at p. 40].

- "[I]f they put a younger nurse back there [in the CDU], it was a waste of a perfectly good nurse" [*Id.* at p. 80].

---

[4]Plaintiff testified that Ms. Phillips made this and similar comments so that plaintiff would not call in for FMLA leave due to staffing levels [Doc. 40-1 at pp. 31—33]. Plaintiff estimates that she did not request FMLA leave on four occasions because of Ms. Phillips' comments [*Id.* at pp. 32—33].

- If plaintiff took family leave, "[y]ou will come back, even if you're off the next day" [*Id*. at p. 41].

Nevertheless, plaintiff continued to take FMLA leave intermittently to care for her son, including in September 2015, October 2015, and November 2015, approximately two weeks prior to her termination [*Id*. at pp. 81—82]. When plaintiff returned to work from her last period of family leave, Ms. Phillips stated very loudly, "Anybody with family leave, you're going" [*Id.* at pp. 21—22]. Mary Kibler responded to Ms. Phillips, "She's right there" and Ms. Phillips replied, "I don't care" [*Id*. at p. 22].

C.      The HIPPA Complaint and Investigation

On December 7, 2015, plaintiff claims that Patient B.C.'s [5] sister, M.N., approached her in the ED and asked her for information about the Patient's care and treatment [Doc. 40-1 at p. 55]. Plaintiff was not the Patient's treating nurse. Plaintiff asked the Patient's primary nurse for permission to talk to the Patient and then asked the Patient and her son, M.A., who was present in the room, for permission to access the Patient's medical record [*Id*. at pp. 57—59]. [6] According to the plaintiff, both the Patient and her son gave plaintiff permission to access the Patient's medical record [*Id*. at pp. 58—59]. The Patient's son and sister agree that plaintiff requested and received their permission to access the Patient's medical record [Doc. 40-10 at ¶ 6; Doc. 40-12 at pp. 10—11]. Plaintiff accessed the Patient's medical record via a computer in the Patient's room and summarized her

---

[5] The Patient and her family members are not identified in this opinion to protect her privacy, although their identities are contained in sealed portions of the record in accordance with the rulings of Magistrate Judge Steger [Docs. 30, 39].
[6] The Patient's son was her power of attorney [Doc. 40-10 at ¶ 5].

diagnosis and treatment [Doc. 40-1 at pp. 59—61]. After answering some questions, plaintiff left the Patient's room. Plaintiff admits she did not make any notation in the Patient's medical record about asking or receiving permission to access the medical record [Doc. 26-1 at pp. 57—58].

On December 9, 2015, Christel West was working as Case Manager in Erlanger's oncology ward [Doc. 26-1 at pp. 118—19]. Ms. West went into the room of the Patient to do a case management assessment to ascertain any needs the Patient had for discharge [*Id*. at pp. 121—22]. After answering some initial questions, the Patient stated she was very upset and wanted something reported [*Id*. at pp. 123—24]. The Patient stated that "her private information had been shared and that she had not given any permission for this information to be shared …[s]he was very upset that her sister now knew about her health condition" [*Id*. at pp. 124—25]. Ms. West asked if the Patient had given the nurse permission to talk with her sister and the Patient responded she did not [*Id*. at p. 125].

Following her conversation with the Patient, Ms. West contacted another case manager to discuss what she needed to do to report a HIPPA violation [*Id*. at pp. 126—27]. Ms. West also reported the incident in RiskPro, a computerized system that Erlanger uses to document anything out of the ordinary [*Id*. at pp. 127—28]. Specifically, her report states:

> Pt states her sister was with her in the ER, and pt is upset because her sister (who Knew pt's nurse, they are neighbors) went to pt's nurse and asked about pt's medical information. Pt states, the nurse showed her records on the computer and was showing pictures of her scans. Pt states she does not see well, but her son was sitting close by and informed the pt of what was going on.

[Doc. 31 at p. 102]. Ms. West also contacted the nurse manager for oncology and Ms. Carman to report the Patient's concern [Doc. 26-1 at pp. 131—32].

Ms. Carman confirmed that she received a phone call from Ms. West stating that an oncology patient complained that "one of the ER nurses had disclosed her health information to her sister against her wishes" [Doc. 26-1 at p. 92]. After obtaining the Patient's name and the date she was in the ED, Ms. Carman accessed the Patient's medical record to find out the identity of her caregiver [*Id*. at p. 94]. By that time, the Patient had been discharged, so Ms. Carman obtained her phone number and called the Patient [*Id*. at p. 96].

When Ms. Carman telephoned the Patient, the Patient stated she was in the car on her way home [*Id*. at p. 97]. The Patient told Ms. Carman that her sister is a "blabbermouth" and "very nosy about her personal business" [*Id*. at p. 98]. The Patient further stated that, while she was in the ED, her sister was given access to review her medical record on the computer by Sonja Coone [*Id*.]. Ms. Carman was concerned that the Patient had identified Ms. Coone by name when the medical record did not identify plaintiff as one of the Patient's nurses [*Id*.]. The Patient's medical record revealed it had been accessed by plaintiff and that she had reviewed the Patient's labs and radiology [*Id*. at pp. 98—99]. The Patient further reported to Ms. Carman that she observed plaintiff showing the Patient's sister the computer screen at the nurses station [*Id*. at p. 99]. Ms. Carman described the Patient's tone as "very adamant," "mad," and "angry" [*Id*. at p. 100]. The Patient explained that plaintiff was a former neighbor of her sister's and therefore they had a personal relationship [*Id*.]. While on the phone call, Ms. Carman heard the Patient's son

in the background confirming the events described by the Patient because he had witnessed them too [*Id*. at p. 101].[7]

Following her conversation with the Patient, Ms. Carman contacted Ms. Phillips about the "next steps" because she considered it a "serious potential HIPPA violation" [*Id*. at pp. 102—103]. Ms. Phillips advised Ms. Carman to contact Ms. Kennedy [*Id*. at p. 104]. Ms. Carman related to Ms. Kennedy the complaint from the Patient, the Patient's son's confirmation of events, and what she had learned from reviewing the Patient's medical record [*Id*. at pp. 106—07].

Later on December 9, 2015, Ms. Carman and Ms. Phillips met with plaintiff to discuss what Ms. Phillips described as "a pretty serious allegation" [*Id.* at pp. 60, 97, 111]. It is worth noting that the parties have differing descriptions of this meeting. Ms. Carman testified that plaintiff did not dispute the Patient's description of events [*Id*. at p. 111]. Plaintiff claims that Ms. Phillips did all the talking and Ms. Carman did not speak during the meeting [*Id*. at p. 61]. Both Ms. Carman and Ms. Phillips claim that Ms. Phillips was only present during the meeting "as a witness" [Docs. 26-3 at ¶ 21, 26-6 at ¶ 14]. Plaintiff claims Ms. Phillips repeatedly cut her off and did not allow her to explain what happened or write a statement [Doc. 26-1 at p. 62]. Ms. Carman testified that she was not sure of "the next steps" due to her brief tenure with Erlanger, but she felt it was an HR decision to

---

[7]The Patient's son disputes this account and states that no one from Erlanger communicated with his mother in his presence about the plaintiff violating the Patient's privacy or whether she had consent to disclose health information to the Patient's sister [Doc. 40-10 at ¶¶ 10—11]. He also testified, as did the Patient's sister, that the Patient had problems with her memory as a result of her treatment and medications [Doc. 40-11 at p. 4; Doc. 40-12 at pp. 3—4].

provide her with guidance on the appropriate sanction [*Id.* at pp. 113—114].  Plaintiff denies admitting that it was wrong to access the Patient's medical record and claims she told them, "I had permission" [Doc. 40-1 at pp. 72—73].

Following the meeting with plaintiff, Ms. Carman consulted with Ms. Kennedy [Doc. 26-1 at pp. 8—9].  Ms. Kennedy then reviewed the situation with Jan Gentry, Erlanger's Employee Relations Director [*Id.* at p. 11].  Ms. Gentry made the decision to terminate plaintiff [*Id.* at p. 12].[8]  Both Ms. Kennedy and Ms. Gentry contend that the specific facts of the situation—that plaintiff was not the Patient's assigned nurse, that no consent was noted in writing, that the records clearly showed plaintiff had accessed the Patient's medical record, and the Patient's complaint—all supported the conclusion that this was a serious HIPPA violation and termination was warranted [*Id.* at p. 11; Doc. 26-4 at ¶¶ 9—10].  Ms. Kennedy states that neither Ms. Carman nor Ms. Phillips expressed an opinion as to the type of discipline that plaintiff should receive or attempted to persuade her or Ms. Gentry to take a particular action [Doc. 26-2 at ¶ 23].  Ms. Phillips prepared the termination notice, but states she "played no role in the decision to terminate" plaintiff [Doc. 26-6 at ¶¶ 17—18].

---

[8]It is worth noting that Ms. Kennedy testified that Ms. Gentry had the "final say-so" on plaintiff's termination, although she admittedly does not recall the details of her conversation with Ms. Gentry [Doc. 26-1 at pp. 11—12].  Ms. Gentry also admittedly does not remember plaintiff, but states that she had the final authority to determine whether an employee should be terminated for a HIPPA violation in December 2015 [Doc. 26-4 at ¶¶ 8—9].  Plaintiff has supplied Erlanger's interrogatory responses which identify Ms. Carman, Ms. Kennedy, and Jeanette Merrill as the individuals who were "involved in or influenced" the termination decision [Doc. 40-7 at p. 6].  Ms. Gentry is not identified in Erlanger's interrogatory responses or initial disclosures [Doc. 40-8].

Following the meeting with Ms. Phillips and Ms. Carman, plaintiff claims that Ms. Phillips directed her to sit in a dark office for a while [Doc. 26-1 at p. 64]. Later, plaintiff states that Ms. Phillips came to the door of the office and advised her that she was terminated [*Id.*]. According to plaintiff, Ms. Phillips also stated, "as far as your son goes and health insurance and stuff, it's not my problem" [Doc. 40-1 at p. 67]. Ms. Phillips made plaintiff continue to sit in the office until the end of her shift, even though she had been terminated [*Id.* at pp. 68—69].

## II.     Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). "Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which

a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id.* at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479—80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## III.    Analysis

### A.    Direct Evidence

Plaintiff has asserted claims of age discrimination in violation of federal and state law and retaliation for her use of FMLA leave. Both types of claims may be proven with either direct or circumstantial evidence. *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 432 (6th Cir. 2014) (FMLA); *Geiger v. Tower Automotive*, 579 F.3d 614, 620 (6th Cir. 2009) (ADEA). Plaintiff argues that the statements made by Ms. Phillips regarding plaintiff's age and use of family leave are direct evidence of discrimination [Doc. 40 at pp. 12—14].

"Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Scheick v. Tecumseh Pub. Sch.*, 766 F.3d 523, 530 (6th Cir. 2014) (quoting *Rowan v. Lockheed Martin Energy Sys., Inc.,* 360 F.3d 544, 548 (6th Cir. 2004)). Statements not made by decisionmakers, or statements made by decisionmakers "unrelated to the decisional process itself cannot suffice to satisfy the plaintiff's burden" under the direct evidence approach. *Geiger,* 579 F.3d at 621 (quoting *Bush v. Dictaphone Corp.,* 161 F.3d 363, 369 (6th Cir. 1998)) (internal alterations omitted). "Direct evidence of discrimination 'must establish not only that the plaintiff's employer was predisposed to discriminate …, but also that the employer acted on that predisposition.'" *Momah v. Dominguez*, 239 F. App'x 114, 121 (6th Cir. 2007) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)); *see Scott v. Potter,* 182 F. App'x. 521, 526 (6th Cir. 2006) ("'Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age,' satisfy this criteria.") (quoting *Carter v. City of Miami,* 870 F.2d 578, 582 (11th Cir. 1989)).

Thus, the Court must determine whether Ms. Phillips was a decisionmaker in plaintiff's termination and whether any of her purported statements were related to the termination decision. With respect to her FMLA claim, plaintiff claims Ms. Phillips made the following statements: "You may have gotten away with this family leave with Yvonne Harris, but you won't get away with it with me"; plaintiff's FMLA leave was a "mental health break"; "This is not [the] time to have a mental breakdown and calling out [for] family leave"; and "Any nurse that has family leave, they're going." Notably, when plaintiff returned from her last period of family leave in November 2015, approximately

two weeks prior to her discharge, Ms. Phillips stated, "Anybody with family leave, you're going."

With respect to her age discrimination claim, Ms. Phillips allegedly made the following statements: plaintiff was an "old woman" and "old fart"; "I know you're getting older and you have problems with your memory. You may need to write this down."; "[I]f they put a younger nurse back there [in the CDU], it was a waste of a perfectly good nurse"; "[T]he ER was set up for younger nurses, not older nurses; … the older nurses … like a bunch of old farts, we didn't know what we were doing." A few of the purported comments reference both plaintiff's age and her use of FMLA leave: "[T]he older nurse[s] that's calling out for family leave, it's got to stop and they've got to go. The ER is not for older nurses. It is for young nurses"; "The older nurse[s], that are taking FMLA leave, … they're going to go"; "[I]t had to stop, that the ER was for young nurses, not old nurses, and that taking family leave was not going to be tolerated."

Erlanger argues that the comments are not direct evidence because Ms. Phillips was not the decisionmaker as to plaintiff's termination [Doc. 27 at p. 16; Doc. 35 at pp. 8—9]. Erlanger relies on the testimony of Ms. Phillips, Ms. Carman, Ms. Kennedy, and Ms. Gentry that the decision to terminate plaintiff was made by Ms. Gentry, that Ms. Phillips was not involved in the *decision* to terminate plaintiff, and that Ms. Phillips made no recommendation or expressed any opinion regarding what discipline should be imposed [*see* Doc. 35]. In response, plaintiff points out that Ms. Phillips conducted the investigatory meeting with plaintiff, she completed the termination paperwork, and she informed plaintiff of her termination; thus, plaintiff contends that Ms. Phillips must have been a

decisionmaker [Doc. 40]. Plaintiff also notes that Erlanger identified Ms. Phillips as "the person who discharged the claimant" in response to her claim for unemployment benefits with the Tennessee Department of Labor and Workforce Development [Doc. 40-6].

The facts reveal that Ms. Phillips was involved in the investigatory process that led to plaintiff's termination, but she did not make the decision to terminate plaintiff and there is no evidence that she made a recommendation or expressed an opinion regarding discipline. *Cf. Hussain v. Highgate Hotels, Inc.*, 126 F. App'x 256, 262 (6th Cir. 2005) ("[a] supervisor is a decision maker … even if a higher level manager must approve her request or recommendation that an employee be terminated"). Thus, she was a not a decisionmaker.

Even if Ms. Phillips made or contributed to the decision to terminate plaintiff, the Court cannot conclude that her statements were tied to the termination decision. The statements by Ms. Phillips are certainly evidence of bias against older employees and employees who use family leave. Her statements that nurses who use family leave "you're going" or "they've got to go" present a close question, particularly the statement made just two weeks prior to plaintiff's termination. However, Ms. Phillips did not say that plaintiff was terminated *because of* her age or her use of family leave. Further, there is no evidence that these statements were made in connection with the investigation of plaintiff's alleged HIPPA violation. Thus, an inference is required to connect the statements to the termination decision and therefore they are not direct evidence of discrimination. *See Herzberg v. Beauty Sys. Group, LLC*, No. 1:08-cv-0216, 2009 WL 3152097, at *4 (E.D. Tenn. Sept. 28, 2009) (Collier, J.).

B.    FMLA Retaliation

The FMLA enables covered employees to take up to twelve weeks of leave per year for various purposes specified in the statute, including caring for a family member with a serious health condition, and that leave may be taken intermittently.   29 U.S.C. § 2612(a)(1)(C) & (b)(1).  The Sixth Circuit recognizes two distinct theories of wrongdoing under the FMLA. *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012); *Killian v. Yorozu Auto. Tenn., Inc.,* 454 F.3d 549, 555–56 (6th Cir. 2006).  The "entitlement" or "interference" theory arises from §§ 2615(a)(1) and 2614(a)(1), which make it unlawful for employers to interfere with or deny an employee's exercise of her FMLA rights (§ 2615(a)(1)), and which require the employer to restore the employee to the same or an equivalent position upon the employee's return (§ 2614(a)(1)).  *Arban v. West Publ'g Corp.,* 345 F.3d 390, 400–01 (6th Cir. 2003).   The "retaliation" or "discrimination" theory, on the other hand, arises from § 2615(a)(2), which prohibits an employer from discharging or discriminating against an employee for "opposing any practice made unlawful by" the Act.  *Id.* at 401.

The complaint asserts both interference and retaliation claims under the FMLA [Doc. 1 at ¶¶ 24—26] and Erlanger has presented summary judgment arguments on both theories [Doc. 27 at pp. 15—17].  However, plaintiff's response only addresses her claims of FMLA retaliation [*see* Doc. 40 at p. 1 ("[t]his is an employment discrimination case involving retaliation under the Family and Medical Leave Act (FMLA) and age discrimination under the Age Discrimination in Employment Act (ADEA) and the Tennessee Human Rights Act (THRA)")].  To establish a prima facie case of FMLA

interference, plaintiff must show that (1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of her intention to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012). Plaintiff has presented no evidence or argument that she requested and was denied FMLA leave to which she was entitled and therefore she cannot establish a prima facie case of FMLA interference. Thus, to the extent that plaintiff intended to assert such a claim, the Court finds that she has abandoned it.

Absent direct evidence of unlawful conduct, FMLA retaliation claims based on circumstantial evidence are evaluated according to the burden-shifting framework announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *Seeger*, 681 F.3d at 283. To establish a prima facie case of FMLA retaliation, a plaintiff must show that (1) she engaged in a statutorily protected activity,[9] (2) this exercise of her protected rights was known to the defendant, (3) she suffered an adverse employment action, and (4) there was a causal connection between the adverse employment action and the protected activity. *Tennial v. United Parcel Serv., Inc.*, No. 15-6356, 2016 WL 6156315, at *9 (6th Cir. Oct. 24, 2016). If the plaintiff satisfies her prima facie showing, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Seeger*, 681 F.3d at 284. If the defendant succeeds, the burden shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful

---

[9]The taking of FMLA leave is considered "protected activity." *See* 29 C.F.R. § 825.220(c); *Demyanovich*, 747 F.3d at 433.

discrimination. *Id.* at 285. "Although the burdens of production shift, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981)) (alteration in original).

Erlanger only disputes the fourth element of the prima facie case, whether plaintiff can establish a causal connection between her use of FMLA leave and her termination [Doc. 27 at p. 17]. Erlanger argues that plaintiff cannot show a causal connection because it has articulated a legitimate, non-discriminatory reason for her termination [Doc. 27 at p. 17]. However, this summarily conflates the first two prongs of the burden of proof; the Court must first evaluate whether plaintiff has presented a prima facie case before addressing the defendant's legitimate, non-discriminatory reason. *See, e.g., Green v. Fidelity Inv.*, 374 F. App'x 573, 577 n.4 (6th Cir. 2010) (in the absence of a prima facie case, the court need not consider whether the employer's reason was pretextual). "In order to establish a causal connection, a plaintiff must show some type of retaliatory intent." *Tennial*, 2016 WL 6156315, at *9. An FMLA retaliation claim accordingly centers around "[t]he employer's motive … because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Edgar v. JAC Prods., Inc.,* 443 F.3d 501, 508 (6th Cir. 2006) (emphasis in original).

Plaintiff relies on the close temporal proximity between her last use of FMLA leave in November 2015[10] and her termination two weeks later, as well as Ms. Phillips' derogatory comments about nurses who take family leave to establish a causal connection [Doc. 40 at p. 15]. "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505 (6th Cir. 2014) (quoting *Mickey v. Zeidler Tool & Die Co.,* 516 F.3d 516, 525 (6th Cir. 2008)); *Herrera v. Churchill McGee, LLC*, 545 F. App'x 499, 501 (6th Cir. 2013). The two-week period between plaintiff's last use of FMLA leave and her termination can easily be considered "very close in time." *See, e.g. Amos v. McNairy Cnty.*, 622 F. App'x 529, 538 (6th Cir. 2015) (termination 17 days after EEOC investigation established causal connection). Plaintiff testified that when she returned from FMLA leave in November 2015, Ms. Phillips commented, "Anybody with family leave, you're going." Further, Ms. Phillips had commented on other occasions "older nurses taking family leave have got to go" and "you won't get away with this [family leave] with me." This evidence

---

[10]In reply, Erlanger complains that plaintiff has not provided any "independent evidence" that she used FMLA leave in November 2015 and that plaintiff admits it was "her responsibility" to "keep up" with her FMLA leave [Doc. 35 at p. 9]. Plaintiff testified that she took intermittent FMLA leave in September, October, and November 2015 [Doc. 40-1 at pp. 20—21] and further that Erlanger's records of her FMLA usage were not always accurate [*Id*. at p. 75]. Plaintiff's testimony of her FMLA leave usage is competent evidence for purposes of summary judgment and the credibility of that testimony is a question for the trier of fact.

raises the inference that plaintiff was terminated because of her use of FMLA leave and satisfies the plaintiff's prima facie case.

Plaintiff does not dispute that Erlanger has articulated a legitimate, non-discriminatory reason for her termination, that is, her alleged HIPPA violation. Thus, the Court next considers whether Erlanger's proffered reasons for plaintiff's termination were, in fact, pretext for retaliation. "[A] reason cannot … be pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *Seeger*, 681 F.3d at 285. Unlike its role in establishing a prima facie case, "temporal proximity cannot be the sole basis for finding pretext." *Donald,* 667 F.3d at 763. However, "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Bell v. Prefix, Inc.,* 321 F. App'x 423, 431 (6th Cir. 2009) (citation and internal quotation marks omitted).

A plaintiff may establish pretext by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action. *Dews v. A.B. Dick Co.,* 231 F.3d 1016, 1021 (6th Cir. 2000). "The three-part test need not be applied rigidly. Rather, pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (citation and internal quotations omitted). Regardless of the method utilized, the plaintiff must produce "sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[] intentionally discriminated against [her]." *Clark v. Walgreen Co.*, 424 F.

App'x 467, 474 (6th Cir. 2011) (citation and internal quotation marks omitted). Plaintiff contends that she can demonstrate pretext by all three methods [Doc. 40 at pp. 16—21].

The first method for showing pretext is that the proffered reasons never happened, *i.e.*, that they are "factually false." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Plaintiff contends that Erlanger's proffered reason has no basis in fact because she received permission from the Patient to access her medical record and because she did not confess to the HIPPA violation as Ms. Carman and Ms. Phillips claimed [Doc. 40 at p. 17].

Erlanger argues that it is entitled to the benefit of the "honest belief rule," [Doc. 27 at pp. 20—22] that is, based on the investigation, Erlanger honestly believed that plaintiff had accessed the Patient's medical record and shared that information without permission. A defendant is entitled to summary judgment on the issue of pretext by showing its "reasonable reliance on the particularized facts that were before it at the time the decision was made." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). "[T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id*. The application of the honest belief rule is not automatic; the plaintiff has the opportunity to present proof to the contrary. *Id*. Erlanger also emphasizes that it is not required to conduct an "optimal" investigation that leaves "no stone unturned" [Doc. 27 at p. 20].

Erlanger correctly argues that it is undisputed that Ms. West received a complaint from the Patient regarding access to her medical records, that Ms. West relayed the complaint to Ms. Carman, and that Ms. Carman then called the Patient who confirmed her

complaint [Doc. 27 at pp. 21—22]. It is also undisputed that plaintiff was not the Patient's treating nurse and that she accessed the Patient's medical records, both facts that Ms. Carman discovered. And, it is undisputed that Ms. Carman and Ms. Phillips met with plaintiff to discuss the Patient's complaint. Thus, the Court cannot say that Erlanger's reason for termination had "*no* basis in fact."

However, the parties disagree about what transpired in the meeting with plaintiff. Most importantly, Ms. Carman and Ms. Phillips claim plaintiff admitted that she accessed the Patient's records without permission. In fact, Ms. Carman included this in her internal memo: "She denies asking the patient at any time if sharing her PHI was permissible" [Doc. 26-3 at p. 24]. Plaintiff vehemently disputes this. She testified that she kept trying to explain her side of the story, but Ms. Phillips cut her off. At one point in her testimony, plaintiff stated that she did explain that she had permission to access the Patient's records and was then cut off [Doc. 40-1 at p. 73]. Thus, there is some evidence that Ms. Carman and Ms. Phillips knew plaintiff did not admit to accessing the records without permission and in fact knew that she did have permission to access the records. As it relates to the honest belief rule, Ms. Carman and Ms. Phillips had these "particularized facts … at the time the decision was made." This is a material dispute because the information gleaned from Ms. Carman's investigation, including the interview with plaintiff, was provided to Ms. Kennedy and Ms. Gentry and upon which the termination decision was based. In sum, Erlanger's reason for termination is not without factual support, but some of those facts are disputed. Thus, plaintiff's pretext argument falls more appropriately in the second category, that the alleged HIPPA violation did not actually motivate her termination.

Erlanger emphasizes that Ms. Gentry, not Ms. Phillips, made the decision to terminate plaintiff and there is no evidence that Ms. Gentry did not honestly believe that plaintiff had committed a HIPPA violation [Doc. 35 at pp. 2—4]. However, as plaintiff notes, the honest belief rule does not apply when the plaintiff relies on the second method of showing pretext, that the stated reason did not actually motivate her termination [Doc. 40 at pp. 22—23]. *See Joostberns v. United Parcel Serv.*, 166 F. App'x 783, 794 n.5 (6th Cir. 2006). Further, the honest belief rule does not apply to a cat's paw case, where a biased subordinate supplies misinformation to a decisionmaker. In such a case, "a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Marshall v. The Rawlings Co.*, 854 F.3d 368, 377 (6th Cir. 2017) (quoting *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006)).[11] This theory holds the "employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011). In order to find liability under a cat's paw theory, a plaintiff must establish: (1) a biased non-decisionmaker "intended … to cause an adverse employment action," and (2) the discriminatory action was a "proximate cause of the ultimate employment action."[12] *Id.* at 422.

---

[11]Because the decisionmaker is relying on a biased recommendation, "the honesty or sincerity of the decisionmaker's belief is irrelevant." *Marshall*, 854 F.3d at 380.

[12]The cat's paw theory has been applied to FMLA retaliation claims and ADEA claims. *Marshall*, 854 F.3d at 378 (FMLA retaliation); *see Seoane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418, 428 (6th Cir. 2014) (suggesting that cat's paw liability would apply to ADEA cases with the same modified second element as a Title VII retaliation claim, that the discriminatory action was a "but-for cause" of the adverse employment action).

The record reflects that Ms. Gentry made the decision to terminate plaintiff and that she relied on the information provided to Ms. Kennedy from Ms. Carman and Ms. Phillips. Although their recollections are somewhat vague, it appears that Ms. Kennedy and Ms. Gentry were persuaded that termination was the appropriate discipline because plaintiff had admitted the violation [*see* Doc. 40-4 at p. 20; Doc. 26-4 at ¶ 9; Doc. 26-1 at p. 11]. However, as noted above, plaintiff disputes this. If the information provided to Ms. Kennedy and Ms. Gentry was not accurate or complete, the Court cannot determine as a matter of law that Erlanger's decision was a reasonably informed and considered one. This dispute of fact, combined with the temporal proximity of plaintiff's termination and the biased statements by Ms. Phillips, is sufficient evidence on which a jury could reject Erlanger's legitimate non-discriminatory reason and infer that Erlanger intentionally discriminated against plaintiff due to her use of family leave. *See Bartlett v. Gates*, 421 F. App'x 485, 491 (6th Cir. 2010) (discriminatory remarks by a non-decisionmaker may be probative evidence of pretext).

C.     Age Discrimination

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge ... or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To prevail on a claim under the ADEA, the ADEA's "because of" language requires that a plaintiff "prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 177–78

(2009) (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 141–43 (2000)). For an employer to take an adverse action "because of age" means "'that age was the "reason" that the employer decided to act.'" *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 133 S. Ct. 2517, 2527 (2013) (quoting *Gross,* 557 U.S. at 176). Age discrimination claims under the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-401, *et seq*., are evaluated using the same analysis. *Blandford v. Exxon Mobil Corp.*, 483 F. App'x 153, 157 (6th Cir. 2012).

To establish a *prima facie* case of age discrimination with circumstantial evidence, the plaintiff must demonstrate that: (1) that she was a member of a protected class; (2) that she was discharged; (3) that she was qualified for the position held; and (4) that she was replaced by someone "substantially younger." *Williams v. Union Underwear Co.*, 614 F. App'x 249, 255 (6th Cir. 2015); *Hale v. ABF Freight Sys., Inc.*, 503 F. App'x 323, 333—34 (6th Cir. 2012) (while some of the Circuit's cases state that an ADEA plaintiff must show that she was replaced by someone outside of the protected class … "it is sufficient to show that a replacement is substantially younger"); s*ee Johnson v. Lockheed Martin Corp.,* 598 F. App'x 364, 368 (6th Cir. 2015) ("A 'substantially younger' person is someone more than six years younger than the plaintiff"). Erlanger has admitted that it "hired nurses outside of the protected class for some of the positions that became available" following plaintiff's termination [Doc. 27 at p. 18]. Thus, it is undisputed that plaintiff can establish a prima facie case of age discrimination and the issue is whether plaintiff can show evidence of pretext.

As with the previous claim, plaintiff must show that Erlanger's legitimate, non-discriminatory reason is pretextual because "the reason was false, and that discrimination was the real reason." *Seeger*, 681 F.3d at 285; *see St. Mary's Honor Ctr.,* 509 U.S. at 519 ("it is not enough ... to disbelieve the employer; the fact finder must believe the plaintiff's explanation of intentional discrimination."); *Blizzard*, 698 F.3d at 283 ("The burden of persuasion is on the plaintiff to show that "age was the 'but-for' cause of the employer's adverse action.""). The parties rely on the same arguments regarding pretext for the age discrimination claims as they did for the FMLA retaliation claim. Accordingly, the Court reaches the same conclusion. Plaintiff has presented evidence of a genuine dispute regarding material facts, combined with the temporal proximity of plaintiff's termination and the biased statements by Ms. Phillips, such that a jury could reject Erlanger's legitimate non-discriminatory reason and infer that Erlanger intentionally discriminated against plaintiff due to her age.

## IV.    Conclusion

For the reasons set forth herein, the defendant's motion for summary judgment [Doc. 26] will be **DENIED**. An appropriate order will be entered.


　　 s/ Thomas W. Phillips
SENIOR UNITED STATES DISTRICT JUDGE